## In re SUPREME LODGE OF THE MASONS ANNUITY.

(District Court, N. D. Georgia. February 2, 1923.)

No. 7831.

1. **Bankruptcy ⚖➡92—Creditors other than original petitioners may be heard in support thereof, on attempted withdrawal by original petitioners.**

It is the right of creditors, other than the original petitioners, seeking to have debtor adjudged a bankrupt, to be heard in support of the petition, when the latter seek to abandon their petition, under Bankruptcy Act, §§ 58a (7), 59f, 59g (Comp. St. §§ 9642, 9643).

2. **Corporations ⚖➡559(3)—Not dissolved by receivership.**

A corporation was not dissolved by a receivership.

3. **Bankruptcy 89(1)—Alleged bankrupt may change front from active defense to submission.**

On petition by creditors to have a corporation adjudged a bankrupt, the latter was not estopped to change front from one of active defense to one of submission, to withdraw a motion to dismiss the petition, and to file answer admitting insolvency.

4. **Bankruptcy ⚖➡89(1)—Involuntary held not converted into voluntary bankruptcy by answer admitting insolvency.**

Where creditors filed a petition to have a corporation adjudged a bankrupt, and the bankrupt filed a motion to dismiss the petition, the withdrawal of the motion and the filing of an answer admitting insolvency and willingness to be adjudged a bankrupt did not, where other creditors appear and defend, convert the involuntary into a voluntary bankruptcy, in view of Bankruptcy Act, §§ 18d, 19 (Comp. St. §§ 9602, 9603).

5. **Bankruptcy ⚖➡72(1)—Uniform test applicable as to subjects of bankruptcy.**

The language used to define the subjects of bankruptcy in Bankruptcy Act, § 4, as amended in 1910 (Comp. St. § 9588), speaks to the entire territory over which Congress has legislative jurisdiction, and means the same thing everywhere, and the language of state Legislatures is important only as it may tend to show the meaning of terms as used

⚖➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

throughout the United States, and that which is an insurance corporation in the meaning of Congress is such in every state or territory, regardless of the name locally assumed by or attributed to it.

6. Bankruptcy ⬢⟞72(1)—Nature of insurance corporation primarily governed by charter.

In determining whether a corporation is an insurance corporation, under Bankruptcy Act, § 4, as amended in 1910 (Comp. St. § 9588), the charter is first to be looked to, but the business really done, and which is to be administered in bankruptcy, may also be looked to, either to explain or to rebut the inferences from the charter powers.

7. Bankruptcy ⬢⟞72(1)—Fraternal benefit association held not to be adjudged a bankrupt; "insurance corporation;" "benevolent corporation;" "business or moneyed corporation."

The Supreme Lodge of the Masons Annuity, a mutual benefit society of the state of Georgia, is either an insurance corporation, within the meaning of Bankruptcy Act 1898, § 4, as amended in 1910 (Comp. St. § 9588), or a benevolent, and not a business or moneyed, corporation, and may not be adjudged a bankrupt, in view of Const. Ga. 1877, art. 3, § 7, par. 18, Civ. Code Ga. 1895, § 2007 et seq., and section 2349 et seq., § 2363; Acts Ga. 1900, p. 71; Acts Ga. 1912, p. 119; Acts Ga. 1914, p. 99.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Benevolent Association; Business Corporation.]

In Bankruptcy. In the matter of the Supreme Lodge of the Masons Annuity, alleged bankrupt. Petition by creditors to have it adjudged a bankrupt. Adjudication of bankruptcy denied.

Little, Powell, Smith & Goldstein, of Atlanta, Ga., for alleged bankrupt.

Spalding, MacDougald & Sibley, of Atlanta, Ga., for petitioning creditors.

A. H. Davis, R. R. Arnold, McClelland & McClelland, and W. H. Terrell, all of Atlanta, Ga., for objecting creditors.

SIBLEY, District Judge. On February 4, 1922, a state court appointed receivers, on the ground of insolvency, for the Supreme Lodge of the Masons Annuity, a corporation. On the same date three of its creditors, averring this to be an act of bankruptcy, filed against it, in this court, a petition in involuntary bankruptcy, describing the company as one engaged in the business of insurance. The Supreme Lodge filed a motion to dismiss the petition, because it showed on its face that the lodge, being an insurance corporation, was not subject to the Bankruptcy Act (Comp. St. §§ 9585–9656). By agreement further proceedings were suspended in the bankruptcy case until the issues over the receivership should be fought out. By January, 1923, the receivership had been confirmed, and large classes of certificate holders in the Supreme Lodge had been reinsured in another company, and various acts of partial administration of the corporate assets accomplished by the receivers.

Thereupon, the original petitioning creditors in bankruptcy having indicated their purpose to abandon their procedure, another creditor by certificate asked leave to be made a party to prosecute the petition, and to amend it by striking the allegation that the alleged bankrupt was a corporation engaged in insurance, and alleging that it was a moneyed

and business corporation, and not an insurance company. The alleged bankrupt, under resolution of its directors, sought to withdraw its motion to dismiss the petition and to file an answer admitting insolvency and its willingness to be adjudged a bankrupt, and praying that it be so adjudged, but accompanied by no schedules. Other creditors also appear, as do the receivers of the state court, no objection being made, to resist the bankruptcy; they principally asserting an estoppel against the. Supreme Lodge to change front in the case, and denying the jurisdiction in bankruptcy over that corporation. Evidence was submitted on both sides, and the case taken under advisement by the judge.

[1] 1. It is the right of creditors other than the original petitioners to be heard in support of the petition, when the latter seek to abandon their petition. This is implied in the requirement of the Bankruptcy Act, §§ 58a (7), and 59g, that all creditors be notified of a proposed dismissal, and is expressly asserted in section 59f. The intervening creditor will be made party plaintiff, and permitted to amend the petition as prayed. So the creditors who seek to defend will be allowed to do so, regardless of the attitude of the alleged bankrupt. Section 59f.

[2-4] 2. The Supreme Lodge itself will be allowed to withdraw its motion to dismiss and to answer as it offers to do. It is elementary that the corporation was not dissolved by the receivership. In re Beaver Cotton Mills (D. C.) 275 Fed. 498. Its directors may still direct its litigation, and no rule of bankruptcy practice prevents it from changing its policy from one of active defense to one of submission. No such voluntary participation in the state court receivership is shown as should be held an estoppel here. The answer, however, is only an answer, and does not bind the objecting creditors, nor convert the involuntary into a voluntary bankruptcy. If this may be done, the allegations of this pleading, unaccompanied by schedules, do not even show such an attempt. The case remains one in involuntary bankruptcy, with creditors both prosecuting and defending, and is so triable by the court without a jury. Bankruptcy Act, §§ 18d, 19.

3. The submission of the alleged bankrupt by no means relieves the question whether it is subject to bankruptcy jurisdiction. The provision on the point of section 4 of the Bankruptcy Act, as amended in 1910, is:

"Any unincorporated company, and any moneyed, business, or commercial corporation, except a municipal, railroad, insurance. or banking corporation * * * may be adjudged an involuntary bankrupt." Comp. St. § 9588.

The term "unincorporated company" is used in opposition to the term "corporation," and refers to combinations of individuals without a charter, but other than partnerships, who act together in a joint adventure or as a joint-stock company or the like. "Corporation" is used, not in the broad sense defined in section 1 (6) of the original act, because as therein excepted such meaning would be "inconsistent with the context," but in the exact sense of an artificial entity created by charter, either de jure or de facto. The Supreme Lodge is such a corporation.

The contention here, on the one hand, is that it is a moneyed or business corporation, but, though a fraternal benefit society, it is not an in-

surance corporation. The contention, on the other hand, is that it is either a benevolent corporation, and so neither a moneyed, business, nor commercial one, or else, being engaged in mutual benefit insurance, is an insurance corporation, and in neither case subject to involuntary bankruptcy. Questions of law are: What did Congress mean by "insurance corporation"? Is the nature of a corporation to be determined by its charter powers, or by the business actually done, or by both? Is the classification of the corporation by the laws of the state of its creation controlling, or is there a uniform test applicable in all parts of the country?

[5] Answering the last first, it is held that the language used to define the subjects of bankruptcy speaks to the entire territory over which Congress has legislative jurisdiction, and means the same thing everywhere. State classification was not regarded, nor intended to be followed, and the language of state Legislatures is important only as it may tend to show the meaning of terms as used throughout the United States. That which is an insurance corporation in the meaning of Congress is such in every state or territory, regardless of the name locally assumed by or attributed to it.

[6] The second question is answered by considering the very nature of a corporation as a creature whose functions and powers arise out of and are limited by its charter. Manifestly that instrument is the natural primary and generally sufficient evidence of the nature of the corporation, which ought to be presumed to do what it was chartered to do. The abandonment by the amendment of 1910 of the business principally engaged in which was the test under the original Bankruptcy Act, indicates that it ought no longer to be looked to in ordinary cases. But a corporation often has power to do many things. The most ancient railroad charter in Georgia which is still used is that of the Georgia Railroad & Banking Company, which gave franchises both as a railroad and as a bank. The company has done no banking business for many years, and its present assets and liabilities are only those of a railroad company. Manifestly, if for bankruptcy purposes it were necessary to determine whether it is a railroad or a banking corporation, it should be held to be the former. So many corporations are chartered both as banks and trust companies. Surely whether such a one was actually doing a banking business could be inquired into, if it was sought to be put in bankruptcy. It is even conceivable that a corporation might be chartered to do every lawful business. Then, of necessity, the business it actually did in making its debts and getting its property must be looked to, in order to test its real nature for bankruptcy purposes. Yet again, corporations may so engage in ultra vires enterprises as totally to depart from the business fixed by charter, and perhaps alter de facto their corporate status. The rule on a related subject is thus stated in 29 Cyc. p. 9:

"The question whether an association is a benevolent or friendly society is ordinarily determined by its object, as expressed in its charter or articles and by-laws; but the fact that it adopts a name indicative of social and beneficial objects, or that it is described in its charter or articles as a beneficial or friendly society. does not render it such, if in fact its main object is that of the ordinary insurance company."

The true rule is that the charter is first to be looked to in classifying the corporation, but that the business really done, and which is to be administered in bankruptcy, may also be looked to either to explain or rebut the inferences from the charter powers.

[7] The first question, What did Congress mean by "insurance corporation"? is best approached by remembering that this is the language of an amendment, an attempt to better the law, requiring consideration of the old law and its difficulties. Section 37 of the Bankruptcy Act of 1867 (14 Stat. 535) made its provisions applicable to moneyed, business, and commercial corporations. These words obtained a specific judicial construction, as excluding public, political, educational, charitable, and social corporations, and including such as engaged in trade or other business for gain (Veazie Bank v. Fenno, 8 Wall. 533, 19 L. Ed. 482), embracing, notwithstanding their quasi public character, railroads (Adams v. Boston Railroad Co., Fed. Cas. No. 47; New Orleans Railroad Co. v. Delamare, 114 U. S. 501, 5 Sup. Ct. 1009, 29 L. Ed. 244), insurance companies (Merchants' Insurance Co/, Fed. Cas. No. 9,441; Hercules Mut. Life Society, Fed. Cas. No. 6,402; Independent Insurance Co., Fed. Cas. No. 7,017), and banks (Thornhill v. Bank of Louisiana, Fed. Cas. Nos. 13,990, 13,992).

The Bankruptcy Act of 1898 made subject to involuntary bankruptcy "corporations *engaged principally* in manufacturing, trading, printing, publishing, mining (Act of 1903), or mercantile pursuits." This test involved, not only difficulties of legal definition, but a question of fact, often intricate, as to the nature and amount of actual business, whereby great confusion arose. For remedy the amendment of 1910 (Comp. St. § 9588) re-established the test of the act of 1867, adopting also, by a familiar rule, the judicial construction which had arisen of it, with the modification that no municipal, railroad, insurance, nor banking corporations were to be bankrupts, either voluntary or involuntary. No reasons for making these exceptions were assigned by the committees of Congress, but they may be surmised to lie in the public or quasi public nature of the business, involving other interests than those of creditors, in the desirability of unarrested operation, the completeness of state regulation, including provisions for insolvency, and the inappropriateness of the bankruptcy machinery to their affairs.

These considerations all apply to insurance corporations. That the business generally may be declared affected with a public interest and subject to extensive regulation was recognized in German Alliance Insurance Co. v. Kansas, 233 U. S. 389, 412, 34 Sup. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189. All states, probably, have in fact regulated insurance companies of all kinds, and provided for their liquidation. The affairs of an embarrassed or insolvent insurance company often require much technical skill and judgment and time for their adjustment and a carrying forward of the business, to prevent lapses and to permit reinsurance to simplify them. And considering the variety of insurance obligations assumed and the various statuses thereof, a chief practical difficulty is the ascertainment of who are really to be considered creditors and in what amounts, often requiring much time and elaborate accounting for its solution. Under such circumstances even

the election of a trustee in bankruptcy would be difficult, and a creditors' meeting could hardly prosecute any business, owing to conflicting interests of the various classes of claims.

All these reasons apply with full force to a modern fraternal benefit insurance organization, and argue the inclusion of corporations doing such business within the broad terms used by Congress. It is true that fraternal benefit societies and orders often have been separately dealt with and favored by Legislatures, and contrasted with or excepted from the general class of "insurance companies." Congress has done the like in the Tax Act of 1916, §§ 10, 11 (3), being Comp. St. 1918, §§ 6336j, 6336k; the Revenue Act of 1917, § 504(d), being Comp. St. 1918, § 6309¼a; and the Tax Act of 1918, §§ 230, 231(3), 503 (d), being Comp. St. Ann. Supp. 1919, §§ 6336⅛nn, 6336⅛o, 6309⅓d. Also it has frequently been held that particular statutes applying to insurance companies and insurance policies did not include fraternal societies and their certificates. But every statute was to be construed according to its own language and purpose and subject-matter, and the construction is of little weight here, and is offset by many conflicts in decisions. The general status of such societies is well set forth in 29 Cyc. p. 7:

"Mutual benefit insurance companies, whether incorporated or unincorporated, are those organizations which are formed not for profit, but for the mutual protection, relief, or benefit of their members' nominated beneficiaries. They are known by various names, usually as beneficiary associations, or benevolent, friendly, or fraternal societies. They resemble mutual insurance companies doing business without capital on the assessment plan, but they differ from those companies in various respects. The main point of distinction lies in the purpose of their organization. They are usually formed, not as insurance companies, but as social and benevolent associations, insurance being an incident, and not the main purpose of the organization, and the insurance feature is adopted, not for the purpose of gain, but for the object of benevolence. * * * While these organizations are thus distinct from insurance companies, yet when they agree with their members, in consideration of the payment of dues or assessments, to indemnify them or their nominees against loss from certain things, such as accident, personal injury, sickness, or death, they conduct an insurance business, and the distinction is so far without a difference. The certificate issued to the member stands in place of the ordinary insurance policy, and is essentially a covenant of insurance."

But, even if the term "insurance company" has acquired a technical significance, opposed to and not including beneficial societies, Congress here avoided its use, and took the expression "insurance corporation," which, while of similar original meaning, is unembarrassed by much legislative and judicial precedent. The supposed legislative favor intended to be extended to a fraternal society would not be served by subjecting it to bankruptcy against its will; even the discharge from its debts being of little practical value to a stripped and broken corporation. The cases of Grand Lodge (D. C.) 232 Fed. 199, and Order of Sparta, 242 Fed. 235, 155 C. C. A. 75, have not been overlooked, but are not thought controlling; the one because not involving a corporation at all, and the other because under the special facts found as to its business it was not engaged in insurance at all. An incorporated fraternal beneficial order may, if its charter, in the light of the business done, shows it to be principally an insurance enterprise, rather than a

social or benevolent one, be an insurance corporation not subject to bankruptcy as such.

5. The character of the corporation sub judice will be examined in the light of its history under the evidence and the laws under which it was chartered and operated. The Constitution of Georgia of 1877 (article 3, § 7, par. 18) denies to the Legislature the power to grant corporate privileges to private companies, and requires the power to be exercised by the courts, except as to banking, insurance, railroad, canal, navigation, express, and telegraph companies, which are to be incorporated by the secretary of state, all as shall be provided by law. In 1898 there existed the act of 1893, by which insurance companies might be incorporated by the secretary of state (Code of 1895, § 2007 and following). Other laws provided for the incorporation of business, charitable, religious, and other corporations by the superior courts (section 2349 and following). Section 2363 of that Code was:

"Library and other literary, charitable, or social organizations, which have no capital stock, and are not organized for individual pecuniary gain, may be incorporated under the provisions of this Code, all of whose provisions are hereby made applicable to the organizations aforesaid."

A reference to the Acts of 1878–79, p. 166, from which this section was codified, shows that the provisions made applicable were only those relating to incorporation by the superior courts. Under this section, on September 8, 1898, the Supreme Lodge of the Masons Annuity was incorporated by the superior court, without capital stock, for a period of 20 years, with the privilege of renewal, and "for the purpose of organizing and conducting a fraternal benevolent order whereby such members of the fraternity of Free and Accepted Masons as may join, by a series of continuing and agreed payments, may accumulate a fund for the assistance and maintenance of such Masons in their old age and to provide for the relief of their widows, orphans and dependents." This charter was renewed in 1918, and slightly amended in January, 1922. Fraternal beneficial orders were first recognized, defined, and regulated in 1900 (Acts of 1900, p. 71), were required to make reports to the Insurance Commissioner and to be licensed by him. There were excepted from the operation of the act "the grand and subordinate lodges of Masons, Knights of Pythias, Odd Fellows, Red Men, Junior Order of American Mechanics, and similar orders that do not have as their principal object the issuance of benefit certificates to members." In 1912 (Acts of 1912, p. 119) a department of insurance was established for Georgia and the entire business of insurance elaborately regulated. Provisions significant here are those of section 3:

"The insurance commissioner may at any time * * * examine into the affairs of any insurance company doing business as an assessment, fraternal, industrial and charitable or otherwise, in this state," etc.

Section 21:

"All insurance companies, * * * including fraternal orders and all other associations, shall be required to have made a strict medical examination of each and every person applying for life insurance."

Section 29 and following provide for liquidations. Section 35 provides for domestic fraternal beneficial societies and associations to be

chartered by the secretary of state under the act of 1893 above referred to and to be licensed by the insurance commissioner. Fraternal benefit societies were again extensively, but separately, regulated by the act of 1914. Acts 1914, p. 99. They were, by section 4, exempted from the provisions of the insurance laws unless specially designated and made subject only to this act. By section 12 organization is provided by preliminary and final certificate from the insurance commissioner. If these certificates are to be considered as charters of incorporation, and not mere licenses to be presented to the secretary of state for his action, the section is probably unconstitutional. In this event, there being no special repeal of section 35 of the act of 1912, that section would seem to remain of force and require incorporation as insurance companies by the secretary of state. But by section 13 previously existing societies were not required to reincorporate. Sections 24 and 25 provide for receiverships, and section 29 exempts from the operation of the law orders somewhat similar to those described in the act of 1900, but the "insurance department" of the Knights of Pythias and of the Junior Order of American Mechanics are excepted from the exception. Besides the elaborate regulations of the act, its last section makes these societies subject to such rules and regulations as may be prescribed by the insurance commissioner.

The practice of the Supreme Lodge of the Masons Annuity seems to have kept pace with these developments of the law. The charter and the law under which it was secured dealt expressly with beneficial and charitable purposes rather than business ones. Its earlier certificates promised payment on named contingencies only out of its annuity fund. Its later certificates, in consideration of fixed dues, and in form similar to insurance policies, promise full payment of fixed sums, and the certificates are issued in nearly all the forms of modern life and accident insurance, to persons selected and chosen under the usual standards of insurance regulations, with premiums calculated and fixed by usual insurance rules. A reserve of about $1,000,000 has been accumulated in the past six years.

It is a fair statement of the Georgia law that the conception of a fraternal and beneficial society has changed from that of benevolence to one of business; the business being insurance of a definite sort and separately regulated, but still insurance. When this company departed from the plan of raising a fund to be distributed to the aged and needy at the discretion of its governing body—this was Masonic benevolence—to a direct obligation to pay to persons chosen, not because of their need, but because of the relative unlikelihood of having to pay them at all, which is business, the realm of the social and charitable was left and that of selfishness entered; mutual insurance pure and simple was undertaken. Calling premiums dues and policies certificates does not alter the essence of the matter. Whether this was permissible under the charter is not under inquiry. The debts so arising and the assets so accumulated are to be administered. There are thousands of certificate holders, of many classes, and more than a million of money and property.

In my opinion this company was in its origin and by its charter a benevolence; by evolution and by its actual business it is a mutual insurance company, with membership limited to such Masons as are chosen as good insurance risks. It is, of course, not the Masonic order, nor any part of it, but a separate corporation. The social and fraternal element lies in the former organization. Whatever the original intent of the latter, its present insurance business is not an organization of Masonic benevolence, or any other kind, although its operations may result in diminishing the number of benevolent objects. Like the insurance departments of the Knights of Pythias and the Junior Order of American Mechanics, it should, under the Georgia law, no doubt be classed as doing an insurance business, and subject to regulation by Georgia statutes, if that be a material consideration here. According to its charter, therefore, it is a benevolent, and not a business or moneyed, corporation. According to its principal object and business at the time of its failure, it was an insurance corporation. Under either view of it, it is not subject to involuntary bankruptcy. So concluding, it is unnecessary to examine other issues as to the trust character of its assets and the like.

Adjudication as a bankrupt is denied.